**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MARIA OLIVEIRA DA SILVA, individually and on behalf of all others similarly situated,<br>*Plaintiff*,<br>v.<br>QUEST CONSUMER, Inc., a Delaware corporation,<br>*Defendant*. | Case No. 2:24-cv-10791<br><br>Hon. Esther Salas |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 5

III. ARGUMENT ..... 5

A. The Controlling Registration Terms Specify That This Court Has Jurisdiction ..... 5

1. The Registration Terms Apply to This Dispute and Specify That They Control Over Contradictory Terms ..... 10

2. The Conflicting Dispute Resolution Provisions Across the Documents Show There Was No Clear Agreement to Agreement ..... 14

B. There Was No Clear Agreement to Arbitrate This Dispute Even Considering the Purchase Terms on Their Own ..... 16

1. Internal Inconsistencies Within the Purchase Terms Preclude Defendant from Demonstrating a Clear Agreement to Arbitrate ..... 17

2. The Total Damages at Issue Surpass the Purchase Terms' Threshold to Resolve the Parties' Dispute in This Court ..... 18

IV. CONCLUSION ..... 19

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Lamps Plus, Inc. v. Varela*,
587 U.S. 176 (2019) ........ 8

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022) ........ 8–9

**United States Circuit Court of Appeals Cases**

*Century Indem. Co. v. Certain Underwriters at Lloyd's*
584 F.3d 513 (3d Cir. 2009) ........ 8

*Field Intelligence Inc v. Xylem Dewatering Sols. Inc*,
49 F.4th 351 (3d Cir. 2022) ........ 8, 14

*Guidotti v. Legal Helpers Debt Resolution, L.L.C.*,
716 F.3d 764 (3d Cir. 2013) ........ 19

*In re Remicade (Direct Purchaser) Antitrust Litig.*,
938 F.3d 515 (3d Cir. 2019) ........ 8

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Skinner Engine Co.*, 188 F.3d 130 (3d Cir. 1999) ........ 9

*Jaludi v. Citigroup*,
933 F.3d 255 (3d Cir. 2019) ........ 8

*Mellon Bank, N.A. v. Aetna Business Credit, Inc.*,
619 F.2d 1001 (3d Cir. 1980) ........ 9, 13

**United States District Court Cases**

*Stabile v. Macy's, Inc.*,
751 F. Supp. 3d 429 (D.N.J. 2024) ........ 14, 16, 18

*Somerset Consulting, LLC v. United Capital Lenders, LLC*,
832 F. Supp. 2d 474 (E.D. Pa. 2011) ........ 19

**State Court Cases**

*Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*,
948 A.2d 1285 (2008) ..........9

*GMAC Mortgage, LLC v. Willoughby*,
165 A.3d 787 (2017) ..........14

*Hess Corp. v. ENI Petroleum US, LLC*,
86 A.3d 723 (2014) ..........8

*Kernahan v. Home Warranty Adm'r of Florida, Inc.*,
199 A.3d 766 (2019) ..........14–15

*NAACP of Camden Cnty. E. v. Foulke Mgmt. Corp.*,
24 A.3d 777 (App. Div. 2011) ..........15

*Rockel v. Cherry Hill Dodge*,
847 A.2d 621 (App. Div. 2004) ..........15–16

*Rosenthal v. Rosenblatt*,
2014 WL 5393243, (N.J. Super. Ct. App. Div. Oct. 24, 2014) ..........9, 18

*Souza-Bastos v. Fed. Auto Brokers, Inc.*,
2016 WL 3199488 (N.J. Super. Ct. App. Div. June 10, 2016) ..........15

*Oxford Realty Grp. Cedar v. Travelers Excess & Surplus Lines Co.*,
160 A.3d 1263 (2017) ..........9

**Rules and Statutory Provisions**

New Jersey Wiretapping and Electronic Surveillance Control Act, N.J. Stat. Ann. § 2A:156A-24 ..........2, 7

Wiretap Act, 18 U.S.C. § 2510, *et seq.* ..........2, 7

# I. INTRODUCTION

Trading off Quest's worldwide brand recognition as one of the globe's largest clinical diagnostics companies, Defendant Quest Consumer, Inc. d/b/a Quest ("Defendant") operates a website, QuestHealth.com, that sells medical testing kits directly to consumers. Individuals can purchase tests related to any number of personal and sensitive medical conditions, including tests for HIV, STIs, pregnancy, and ovarian reserve. One would naturally expect their doctor to keep the fact that these tests were discussed or taken a confidential and private part of one's medical record. Defendant's website users had a similar expectation of privacy, notwithstanding that heir lab visits were virtual. Defendant, however, exploited this difference in medium, purposefully injecting a snippet of code in its website that surreptitiously rerouted website visitors' usage data—including the medical tests they viewed—to a third-party company, Tealium. Tealium in turn, used this sensitive data to build up an advertising profile for consumers, using it to send targeted and personalized advertisements to consumers across the internet. *See* Tealium, https://tealium.com/ ("Marketing & Business: Unlock the power of real-time data to drive personalized customer experiences and maximize ROI.") (last visited Apr. 2, 2025).

Plaintiff Oliveira da Silva ("Plaintiff"), like thousands of others, registered for an account on Defendant's website, thereafter searching for and ultimately

purchasing a medical test. While she expected to provide information to Defendant in connection with this, she also expected that it would be kept confidential. Defendant, though, caused this data to be sent to Tealium without her knowledge or consent. She filed this suit alleging that Defendant's conduct violates the Wiretap Act, 18 U.S.C. § 2510, *et seq.*, and the New Jersey Wiretapping and Electronic Surveillance Control Act, N.J. Stat. Ann. § 2A:156A-24.

Defendant now contends that Plaintiff cannot advance her suit in this Court, and that it must instead be sent to arbitration. Defendant rotely advances run-of-the-mill arbitration arguments: highlighting the applicability of the Federal Arbitration Act ("FAA"), the screens that Plaintiff clicked through, and terms linked to in a hyperlink on the purchase screen (the "Purchase Terms," Exhibit 1-A to the Declaration of Michael W. Ovca ("Ovca Decl."), attached as Exhibit 1), and whether the dispute is within the scope of the arbitration clause. But conspicuously absent from Defendant's argument is that Defendant presented an entirely different set of terms when Plaintiff first registered for an account on Defendant's website, before she made any purchase (the "Registration Terms," Exhibit 1-B to the Ovca Decl.).

The Registration Terms govern issues arising out of the creation of and use of an account on Defendant's website. (Registration Terms, § 1 ("This [Registration] Agreement applies to your use of the Account Service."). Plaintiff's

allegations arise out of the use of her account: namely that Defendant caused her unique customer account ID, linked with personally identifiable information and the webpages of health tests she browsed and purchased, to be unknowingly sent to a third-party data broker. (Dkt. 1 (the "Compl.") ¶¶ 27–28, 41, 44.) The Registration Terms provide that "any dispute related to [the Registration Terms] shall be resolved exclusively by the state and federal courts of the State of New Jersey." (Registration Terms, § 12.) The Registration Terms go on to say that if there is a conflict between the Registration Terms and different signed written agreement between the parties related to the account, "the [Registration Terms] will control." (*Id.* § 14.) Thus, Defendant's own Registration Terms expressly provide that this Court "shall" have jurisdiction. Even ignoring this mandatory language, the inconsistencies in dispute resolution processes across the agreements—this Court, on the one hand, and arbitration, on the other—show that there is no clear agreement to arbitrate this dispute.

Defendant wholly ducks this dispositive issue. Its omission is even more glaring given that (i) Plaintiff alleges the existence of the Registration Terms, (Compl. ¶ 38); (ii) Plaintiff alleges that her claim can proceed even if she never made a purchase, (*id.* ¶ 29); (iii) Defendant acknowledges Plaintiff put in the identifying information "required to register an account" before she "used that account to make a purchase," (Declaration of Michael Brunelle (the "Brunelle

Decl."), ¶ 13, attached to Defendant's motion); (iv) Defendant agrees Plaintiff "logged into her account to view those results," (Brunelle Decl. ¶ 16); and (iv) that Plaintiff's counsel asked Defendant's counsel for a complete copy of the Registration Terms prior to Defendant filing its motion, which Defendant refused to provide, (Ovca Decl. ¶ 4). Defendant may prefer to pretend the Registration Terms do not exist, but that doesn't make it so. Defendant cannot disavow the controlling agreement that it drafted and required accountholders to agree to. The Court should decide that the Registration Terms control and that, pursuant to those Terms, this case in the correct forum.

Defendant's motion to compel fails even ignoring the controlling language of the Registration Terms. First, the Purchase Terms are internally inconsistent in which disputes can be brought in a court of competent jurisdiction, and which claims are to be arbitrated. This inconstancy demonstrates insufficient mutuality of assent to form an arbitration agreement. Second, the Purchase Terms allow disputes for more than $750,000 to be brought in court rather than arbitration. Plaintiff claims statutory damages on behalf of herself and a class of thousands of similarly situated individuals that far surpass this threshold figure. For the reasons set out below, the Court should deny Defendant's motion to compel arbitration and allow this case to proceed in federal court.

## II. FACTUAL BACKGROUND

Quest Diagnostics is one of the world's largest publicly traded clinical laboratory companies. (Compl. ¶ 12.) An offshoot, Quest Consumer, Inc., offers direct-to-consumer lab tests that do not require a doctor's referral, including tests for sensitive medical conditions, such as STDs, HIV, pregnancy, and ovarian reserve. (*Id.* ¶¶ 3, 16.) To purchase a lab test on QuestHealth.com, visitors must first create an account. (*Id.* ¶ 26.) During registration, visitors are required to enter personal information such as their first name, last name, gender, date of birth, physical address, phone number, and email address. (*Id.*) To complete the registration process, users click a button next to a disclosure that reads "By clicking 'Register', I agree to the [Registration] Terms and Conditions." (*Id.* ¶ 38.) The Registration Terms were accessible via a hyperlink. (*Id.* ¶¶ 38, 39.)

The Registration Terms "[w]elcome [you] to the Quest Consumer Inc. Account Service ("Account Service"). This Account Service allows you to create an account on questhealth.com." (Registration Terms, Preamble.) The Registration Terms "appl[y] to your use of Account Services." (*Id.* § 1.) Users are informed that "[a]ny dispute between Quest Consumer and You related to this Agreement shall be resolved exclusively by the state and federal courts of the State of New Jersey." (*Id.* § 12.) The Registration Terms further provide that "if there is any conflict between this Agreement and a signed written agreement between You and Quest

Consumer related to the Account Service, this Agreement will control." (*Id.* § 14.)

Plaintiff registered for an account and accepted the Registration Terms. (Compl. ¶¶ 7, 37.) She thereafter browsed Defendant's website, searching for various lab tests. (*Id.* ¶ 41.) She ultimately purchased a blood typing test for $35. (*Id.*)

Unbeknownst to Plaintiff and without her consent, throughout the time that she was browsing QuestHealth.com, her interactions were being tracked and shared with a third party. (*Id.* ¶¶ 5–6, 44.) Specifically, Defendant configured a software package called Tealium iQ to capture and share with third party Tealium various user data points, including Quest customer ID, test specimen ID, test name, order number, email, order total, URLs visited, city, state, zip code, approximate geographical coordinates, gender, birth year, and credit card provider. (*Id.* ¶¶ 27–28.) This happened in the background of Plaintiff's web browser; Defendant directed the browser to transmit this information Tealium's servers within milliseconds after loading pages on QuestHealth.com. (*Id.* ¶¶ 30, 56.) From there, Tealium used this information to identify Quest customers on platforms like Google and Facebook for delivering personalized advertisements and to develop machine learning models that predict customers' future purchasing habits. (*Id.* ¶¶ 5, 33–36.)

Plaintiff filed this suit on behalf of herself and a class of other users of

Defendant's website, asserting violations of the Wiretap Act, 18 U.S.C. § 2510, *et seq.*, and the New Jersey Wiretapping and Electronic Surveillance Control Act, N.J. Stat. Ann. § 2A:156A-24. (*Id.* ¶¶ 52–63; 64–75.) Plaintiff seeks damages for each violation, which she alleges exceed $5,000,000 in the aggregate. (*Id.* ¶¶ 9, 63, 75.)

## III. ARGUMENT

### A. The Controlling Registration Terms Specify That This Court Has Jurisdiction.

Defendant invokes the arbitration provision in the Purchase Terms as the sole basis for its motion to compel. (*See generally* Def.'s Mot. to Compel (the "Motion"); Purchase Terms § 25.) Defendant, however, ignores that an earlier-agreed to set of terms, the Registration Terms, govern this dispute. At this stage, the Court must apply standard contract formation principles to determine which agreement controls and whether the parties have entered into an agreement to arbitrate the instant dispute. Contrary to the Purchase Terms, the Registration Terms specify that federal courts in New Jersey have jurisdiction to decide disputes like this one. (*See* Registration Terms § 14.) The Registration Terms further state that in any conflicts between the Registration Terms and any other agreements that may be entered into in connection with the website—like the Purchase Terms, which have no conflict provision whatsoever—the Registration Terms will control. (*Id.* § 12.) Carrying out the requisite analysis shows that, per

the Registration Terms, Plaintiff's claims can proceed before this Court.

"Before compelling any party to arbitrate pursuant to the FAA, a court must consider two 'gateway' questions: (1) 'whether the parties have a valid arbitration agreement at all' (i.e., its enforceability), and (2) 'whether a concededly binding arbitration clause applies to a certain type of controversy' (i.e., its scope)." *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 519 (3d Cir. 2019) (quoting *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 186 (2019)). Because there are two competing agreements at issue in this case, the Court must address the first gateway question. *See Field Intelligence Inc v. Xylem Dewatering Sols. Inc*, 49 F.4th 351, 356 (3d Cir. 2022) ("[W]e hold that the parties' supersession dispute is for a court, not an arbitrator, to decide."); *Jaludi v. Citigroup*, 933 F.3d 246, 255 (3d Cir. 2019) ("[W]hether a later agreement supersedes a prior arbitration agreement is tantamount to whether there is an agreement to arbitrate."). Courts "apply 'ordinary state-law principles that govern the formation of contracts' to determine whether [a] subsequent arbitration agreement supersedes a prior agreement." *Jaludi*, 933 F.3d at 254 (quoting *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 524 (3d Cir. 2009)); *see also Hess Corp. v. ENI Petroleum US, LLC*, 86 A.3d 723, 727 (2014) ("Contract interpretation is a question of law."). Importantly, there is no presumption in favor of arbitrability when making this determination. *Jaludi*, 933 F.3d at 255; *Morgan v. Sundance,*

*Inc.*, 596 U.S. 411, 418 (2022) ("Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind. But a court may not devise novel rules to favor arbitration over litigation.").

In interpreting contracts, "[c]ourts first look to the plain meaning of the language at issue." *Oxford Realty Grp. Cedar v. Travelers Excess & Surplus Lines Co.*, 160 A.3d 1263, 1270 (2017) (citing *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285 (2008)). "If the language is clear, that is the end of the inquiry." *Chubb Custom Ins. Co.*, 948 A.2d at 1290 (citing *Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262 (2001)). Courts may not "create an ambiguity where none exists." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Skinner Engine Co.*, 188 F.3d 130, 145 (3d Cir. 1999) (internal quotation and citations omitted); *see also Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir. 1980) ("The strongest external sign of agreement between contracting parties is the words they use in their written contract . . . a court will make no inference or give any construction to the terms of a written contract that may be in conflict with the clearly expressed language of the written agreement."). However, "when a transaction is documented in several agreements, arbitration provisions that conflict or are inconsistent with each other may create ambiguity that will preclude enforceability." *Rosenthal v. Rosenblatt*, A-3753-12T2, 2014 WL 5393243, at *4 (N.J. Super. Ct. App. Div. Oct. 24, 2014). Here, the

Registration Terms expressly provide that they govern this dispute if there are any conflicts between the Registration Terms and other agreements users may enter into with Defendant.

### 1. The Registration Terms Apply to This Dispute and Specify That They Control Over Contradictory Terms.

The Registration Terms broadly apply to and govern the creation, access, or use of an account on QuestHealth.com. (Registration Terms, Preamble; § 5.) The Registration Terms' applicability throughout an accountholder's interactions with the QuestHealth.com website is reflected throughout the Terms. (*See id.* § 5 ("All materials available through the Account Service may be accessed, downloaded or printed for the noncommercial purpose and solely within the scope allowable by this Agreement."); *id.* § 2 (discussing "content accessed through the Account Service" and contemplating any "advice, course of treatment, diagnosis [and] any other information, services or products that you may obtain through the account service."); *id.* § 5 (acknowledging that "names, trademarks, service marks and logos appear[] on the Account Service"); *id.* § 8 (noting that "[t]he Account Service may include content that You find offensive, including health-related content that is sexually explicit"); *id.* § 9 (warning that "[t]he Account Service may contain third party-owned content (e.g., articles, data feeds, abstracts, etc.) and may also include hypertext links to third party-owned web sites").) The Registration Terms govern the user's complete use of their account on the website.

The present dispute is rooted in Defendant's provision of the Account Services. As part of the registration process, users are required to input their first name, last name, gender, date of birth, physical address, phone number, and email address. (*Id.* § 3; Compl. ¶ 26; *see also* Brunelle Decl. ¶ 13.) Following the provision of that information, Defendant configured the Tealium iQ tag to track users as they browse the website, linking the URLs visited on QuestHealth.com with the Quest customer ID assigned to that unique accountholder. (Compl. ¶¶ 27–29.) The Tealium iQ tag will certainly capture any tests that an accountholder orders, as well as key details about that order. (*Id.* ¶¶ 27–28.) However, accountholders will also have sensitive health information—in the form of the medical tests they are browsing, such as pregnancy or HIV tests—unknowingly disclosed to Tealium even before they purchase a test, or if they never make a purchase at all. (*Id.* ¶ 29.) That Plaintiff and accountholders like her could pursue the instant claims without ever making a purchase or clicking any checkbox next to the Purchase Terms at all confirms that this dispute is governed by the Registration Terms in the first instance. Those Registration Terms provide that all "dispute between Quest Consumer and You related to this Agreement shall be resolved exclusively by the state and federal courts of the State of New Jersey." (Registration Terms § 12.) Plaintiff complied with this requirement by filing her suit before this Court.

To the extent that individuals like Plaintiff did ultimately make a purchase after registering for an account—which Defendant admits Plaintiff did the same day she agreed to the Registration Terms, (Brunelle Decl. ¶¶ 13–14)—that does not change the Registration Terms' applicability to this case. Any purchases that users make on QuestHealth.com indisputably relate to an account service; no element of Plaintiff's claim relates solely to the purchase process, standing alone. Users, in fact, cannot make any purchases at all without first creating an account, agreeing to the Registration Terms, and providing identifying information. (Compl. ¶¶ 26–27; Brunelle Decl. ¶¶ 4–5.) Any purchases that an accountholder makes are tied to that accountholder's "customer ID" along with specific details about that purchase, down to the order number, credit card number, and order total. (Compl. ¶¶ 27–28.) This type of information about purchased tests are housed in the user' account; indeed, the Registration Terms discuss allowing certain third parties—but not Tealium—to access details housed in the account. (Registration Terms § 8 (recognizing that accountholders can "allow third-party service provider (such as a Personal Health Record or PHR) to retrieve, provide, modify or otherwise use health and other information in Your account or otherwise").) Defendant acknowledges that users even view their resulting reports by logging into their account, (Brunelle Decl. ¶ 16), a page visit that would be logged and distributed to Tealium.

The Registration Terms expressly provide that they are to control if there are other competing terms entered into between a QuestHealth.com user and Defendant that relate to an Account Service. (Registration Terms § 14 ("If there is any conflict between this Agreement and a signed written agreement between You and Quest Consumer related to the Account Service, this Agreement will control.").) Notably, there is an integration clause in the Registration Terms providing that they replace any prior agreements related to the account service. (*Id.* "[T]his Agreement is the entire agreement between You and Quest Consumer related to the Account Service, replacing any prior agreements[.]").) In contrast, the Purchase Terms do not contain any similar clause or statement that they are to replace conflicting terms or any earlier agreements. (*See generally* Purchase Terms.) There is nothing in the Purchase Terms that would rescind or supersede the Registration Terms' express directive that they are to control if a conflict exists between the two sets of terms. Thus, the Registration Terms' mandate that they "will control" must be followed. (Registration Terms § 14.) Plaintiff's case is in the appropriate forum even if she agreed to both sets of terms.

New Jersey contract law principles confirm this fact. Foremost, to hold otherwise would impermissibly ignore the express command of the Registration Terms, which address how conflicting terms across the agreements are to be interpreted and where this case must be filed. *See Mellon*, 619 F.2d at 1009. To the

extent that elements of the Purchase Terms were intended to replace related terms in the Registration Terms, the parties would have had to clearly indicate as much. *See Field Intelligence*, 49 F.4th at 359 (finding no supersession when "the [later] contract does not even mention its predecessor, let alone expressly indicate any intent to replace that earlier agreement"); *GMAC Mortgage, LLC v. Willoughby*, 165 A.3d 787, 796 (2017). As noted above, the Purchase Terms do not contain any such indication. Thus, Plaintiff is left with two contradictory instructions. Section 14 of the Registration Terms resolves these otherwise-conflicting provisions in favor of this Court's jurisdiction.

#### 2. The Conflicting Dispute Resolution Provisions Across the Documents Show There Was No Clear Agreement to Agreement.

Even completely ignoring Section 14's express direction that it is to control, the contradictory instructions across the documents—particularly when they were all signed the same day—is enough to show insufficient mutuality of assent to arbitration. *See Stabile v. Macy's, Inc.*, 751 F. Supp. 3d 429, 440 (D.N.J. 2024) ("The flavor of one part (arbitration is not required) is at odds with another part (arbitration is required). And that dissonance generates at least as much in the way of 'misleading … lack of clarity' as a small typeface or confusing sentence order."); *Kernahan v. Home Warranty Adm'r of Florida, Inc.*, 199 A.3d 766, 779 (2019) ("[T]he provision[s'] terms cannot be read to provide clarity to a consumer

that she was agreeing to arbitration[.]”).

Even where competing contracts *all* had arbitration provisions, courts have rejected their application when they were inconsistent across iterations, finding that mutual assent to arbitration agreement was lacking. In *Souza-Bastos v. Fed. Auto Brokers, Inc.*, for example, a plaintiff signed three different documents in connection with the purchase of a car. A-1594-15T3, 2016 WL 3199488, at *1 (N.J. Super. Ct. App. Div. June 10, 2016). Every one of the documents contained an arbitration clause; however, each arbitration clause varied in the specific compliance requirements. *Id.* And while one version did contain a supersession clause, it was not apparent which document was signed first. *Id.* The court held that *none* of the arbitration clauses were enforceable and denied the motion to compel. *Id.* at *2 (“[T]he cumulative effect of the many inconsistencies and unclear passages in the arbitration terms within the [three documents] compel us to declare them unenforceable for lack of mutual assent.”) (quotations omitted); *see also* *NAACP of Camden Cnty. E. v. Foulke Mgmt. Corp.*, 24 A.3d 777, 797 (App. Div. 2011) (“It is unreasonable to expect a layperson to pore through the many arbitration provisions scattered within these multiple documents and discern which provisions are operative and exactly what they mean.”); *Rockel v. Cherry Hill Dodge*, 847 A.2d 621, 625 (App. Div. 2004) (“[W]e conclude that defendant’s inclusion of two conflicting arbitration provisions in the contract documents

confounds any clear understanding of the parties' undertaking and tilts the balance . . . in plaintiffs' favor."). The inconsistency is even more glaring here, where the differing terms provide completely separate dispute resolution processes.

Defendant cites one case after another discussing when consumers will be found to have agreed to an online contract like the Purchase Terms. (Mot. at 9–11.) But this authority is irrelevant. Defendant sidesteps the critical issue: the interaction between the Purchase Terms and the Registration Terms. Defendant does not substantively address the Registration Terms at all, nor does it grapple with their interplay. (*See generally* Mot.) Even accepting that Plaintiff agreed to the Purchase Terms, for the reasons discussed above, that does not change the analysis of Defendant's motion or its outcome. The issue before the Court is not the typical arbitration dispute about whether fonts were big enough, hyperlinks were highlighted, or a button situated appropriately. Rather, "in this case, the difficulty is not a visual or linguistic lack of surface clarity. It runs deeper. The difficulty is the underlying substance itself—the tension between the parts of the asserted contract." *Stabile*, 751 F. Supp. 3d at 440. Section 14 of the Registration Terms and New Jersey law recognize that resolving this tension leaves Court with jurisdiction over Plaintiff's dispute.

### B. There Was No Clear Agreement to Arbitrate This Dispute Even Considering the Purchase Terms on Their Own.

While Defendant's Motion should be denied because of the Registration

Terms' applicability, it falls on alternative grounds even if the Purchase Terms are considered in a vacuum—which, to be clear, they cannot. First, the Purchase Terms themselves are internally inconsistent as to which disputes must be arbitrated versus which disputes can be brought in court. Such inconsistencies are fatal to Defendant's motion. Second, the Plaintiff's dispute exceeds the damages threshold in the Purchase Terms that would shift the forum from arbitration to this Court. Under any metric, Defendant's motion is appropriately denied.

**1. Internal Inconsistencies Within the Purchase Terms Preclude Defendant from Demonstrating a Clear Agreement to Arbitrate.**

The Purchase Terms purportedly require arbitration for disputes in Section 25. However, the very next section states that any breach of the agreement—which Defendant's conduct is alleged to be—entitles one "to equitable relief, including a temporary restraining order, an injunction, specific performance, **and any other relief that may be available from a court of competent jurisdiction**." (Purchase Terms § 26 (emphasis added).) Plaintiff seeks equitable relief in her complaint, including an injunction. (Compl., Prayer for Relief § d.) Thus, contrary to the preceding section, the Purchase Terms would invest a court of competent jurisdiction, like this one, the authority to hear claims for injunctive relief "and any other relief"—although whatever that is remains undefined. (Purchase Terms § 26.) This internal inconsistency is enough to demonstrate there can be no mutual

assent to the appropriate dispute resolution process even within the Purchase Terms, standing alone. *See Rosenthal*, 2014 WL 5393243, at *8 (denying motion to compel arbitration when presented with competing versions of arbitration clauses, noting "the uncertainty as to what, if any, claims could still be pursued in court was further muddied by the lack of clarity and inconsistencies in the ancillary documents that were integrated into the [agreement]"); *see also Stabile*, 751 F. Supp. 3d at 440.

**2. The Total Damages at Issue Surpass the Purchase Terms' Threshold to Resolve the Parties' Dispute in This Court.**

The excerpt from the Purchase Terms' arbitration provision in Mr. Brunelle's declaration addresses disputes for less than $750,000. (Brunelle Decl. ¶ 9.) But Mr. Brunelle omits the rest of the paragraph—and in fact fails to attach a complete copy of the Purchase Terms at all—in which the Purchase Terms plainly state that "[a]ny dispute concerning $750,000 or more will be resolved exclusively in the Federal courts of New Jersey." (Purchase Terms § 25.) In invoking this Court's jurisdiction, Plaintiff asserts that the amount in controversy in this dispute exceeds $5,000,000. (Compl. ¶ 9.) Notably, the provision broadly states that this Court will exclusively resolve "any dispute concerning $750,000 or more." There is no qualifier, as there is with disputes concerning less than that amount, limiting its applicability to "dispute[s] between You and Us." (*Compare* Purchase Terms § 25 ("Any dispute between You and Us concerning an amount less than $750,000

shall be submitted to arbitration…") *with id.* ("Any dispute concerning $750,000 or more will be resolved exclusively in the Federal courts of New Jersey."). Even if there were such a qualifier, "You" is defined to include "the purchaser of any of the Services." (Purchase Terms, Preamble.) This definition is not limited to an individual purchaser or a purchaser in their individual capacity. (*Id.*) Because this dispute between purchasers of Services, on the one hand, and Defendant, on the other, exceeds $750,000, this Court is the appropriate—and in fact exclusive—forum under the Purchase Terms.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion to compel. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 774 (3d Cir. 2013) ("[A]rbitrability not being apparent on the face of the complaint, the motion to compel arbitration must be denied…"). Alternatively, to the extent that "the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then 'the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question.'" *Id.* (quoting *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)).

Respectfully submitted,

Dated: April 2, 2025

By: [signature]

Matthew A. Schiappa
mschiappa@lomurrolaw.com
LOMURRO MUNSON, LLC
Monmouth Executive Center
4 Paragon Way, Suite 100
Freehold, New Jersey 07728
Tel: (732) 414-0300
Fax: (732) 431-4043

By: /s/ Michael W. Ovca

Michael Ovca*
movca@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378

**Admitted pro hac vice*

*Counsel for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of April, 2025, the foregoing was served on Defendant's counsel via email, pursuant to the Court's Order dated March 28, 2025 (Dkt. No. 16), at the following addresses:

paul.rosenthal@faegredrinker.com
krista.hartrum@faegredrinker.com

Matthew A. Schiappa