**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MARIA OLIVEIRA DA SILVA, individually and on behalf of all others similarly situated,<br>*Plaintiff*,<br>v.<br>QUEST CONSUMER, Inc., a Delaware corporation,<br>*Defendant*. | Case No. 2:24-cv-10791<br>Hon. Esther Salas |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S RENEWED MOTION TO COMPEL ARBITRATION**

## TABLE OF CONTENTS

**I. INTRODUCTION** .......... 1

**II. FACTUAL BACKGROUND** .......... 4

**A. The Complaint's Allegations** .......... 4

**B. Arbitration-Related Discovery** .......... 6

**III. ARGUMENT** .......... 7

**A. The Registration Terms Mandate Disputes Related to Account Services "Shall Be Resolved Exclusively" by This Court.** .......... 7

**B. The Conflicting Dispute Resolution Provisions Across the Documents Show There Was No Clear Agreement to Arbitrate** .......... 16

**C. The Total Damages at Issue Surpass the Purchase Terms' Threshold to Resolve the Parties' Dispute in This Court** .......... 18

**IV. CONCLUSION** .......... 19

# TABLE OF AUTHORITIES

## United States Supreme Court Cases

*Lamps Plus, Inc. v. Varela*,
587 U.S. 176 (2019) .......... 8

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022) .......... 9

## United States Circuit Court of Appeals Cases

*Century Indem. Co. v. Certain Underwriters at Lloyd's*,
584 F.3d 513 (3d Cir. 2009) .......... 9

*Field Intel. Inc v. Xylem Dewatering Sols. Inc*,
49 F.4th 351 (3d Cir. 2022) .......... 8, 15

*Guidotti v. Legal Helpers Debt Resol., L.L.C.*,
716 F.3d 764 (3d Cir. 2013) .......... 19

*In re Remicade (Direct Purchaser) Antitrust Litig.*,
938 F.3d 515 (3d Cir. 2019) .......... 8

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Skinner Engine Co.*,
188 F.3d 130 (3d Cir. 1999) .......... 9–10

*Jaludi v. Citigroup*,
933 F.3d 246 (3d Cir. 2019) .......... 8–9

*Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*,
619 F.2d 1001 (3d Cir. 1980) .......... 10, 14

*Phillips v. Cnty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008) .......... 7 n.1

*Symrise, Inc. v. Kennison*,
24-2657, 2026 WL 575177 (3d Cir. Mar. 2, 2026) .......... 16

**United States District Court Cases**

*Kellner v. Amazon, Officers, Directors, and Shareholders*,
CV 22-01124 (GC) (JTQ), 2024 WL 4318769 (D.N.J. Sept. 26, 2024)........7 n.1

*S. Millville Props. LLC v. Westchester Surplus Lines Ins. Co.*,
698 F. Supp. 3d 766 (D.N.J. 2023) ..............................................................7 n.1

*Stabile v. Macy's, Inc.*,
751 F. Supp. 3d 429 (D.N.J. 2024) .............................................................. 16, 18

**State Court Cases**

*Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*,
948 A.2d 1285 (App. Div. 2008) ........................................................................9

*GMAC Mortg., LLC v. Willoughby*,
165 A.3d 787 (App. Div. 2017) ......................................................................15

*Hess Corp. v. ENI Petroleum US, LLC*,
86 A.3d 723 (App. Div. 2014) ...........................................................................9

*Kernahan v. Home Warranty Adm'r of Fla., Inc.*,
199 A.3d 766 (App. Div. 2019) ......................................................................17

*NAACP of Camden Cnty. E. v. Foulke Mgmt. Corp.*,
24 A.3d 777 (App. Div. 2011) ........................................................................17

*Oxford Realty Grp. Cedar v. Travelers Excess & Surplus Lines Co.*,
160 A.3d 1263 (App. Div. 2017) ......................................................................9

*Rockel v. Cherry Hill Dodge*,
847 A.2d 621 (App. Div. 2004) ................................................................ 17–18

*Rosenthal v. Rosenblatt*,
A-3753-12T2, 2014 WL 5393243 (N.J. Super. Ct. App. Div. Oct. 24, 2014)...10

*Souza-Bastos v. Fed. Auto Brokers, Inc.*,
A-1594-15T3, 2016 WL 3199488 (N.J. Super. Ct. App. Div. June 10, 2016)..17

*Zacarias v. Allstate Ins. Co.*,
775 A.2d 1262 (App. Div. 2001) ........................**Error! Bookmark not defined.**

**Federal Statutes**

Wiretap Act, 18 U.S.C. § 2510, *et seq.* ....................................................................6

**State Statutes**

New Jersey Wiretapping and Electronic Surveillance Control Act,
N.J. Stat. Ann. § 2A:156A-24 ........................................................................6

# I. INTRODUCTION

Arbitration-related discovery confirmed that Defendant Quest Consumer, Inc. d/b/a Quest ("Defendant") installed tracking software on its website, QuestHealth.com, that began operating from the first moment a user loaded the website. (Ex. 1-A, Def.'s Resp. to Interrog. No. 6, attached to the Declaration of Michael Ovca (the "Ovca Decl."), attached hereto.) To make a purchase on the website, Plaintiff Maria Oliveira da Silva ("Plaintiff") was required to go through an account registration process, agreeing to Registration Terms that Defendant stipulated are accurate. (*Id.* at Def.'s Resp. to Interrog. No. 5.) When she registered her account, she was assigned a unique customer ID that was associated with her throughout her interactions with Defendant's website. (Ex. 1-B, Feb. 26, 2026 Email from Def.'s Counsel, attached to the Ovca Decl.) Plaintiff's account information, including customer ID, website usage data, the medical test results she viewed, and a host of other data, was surreptitiously rerouted to a third-party advertising and analytics company, Tealium. (Dkt. 1 (the "Compl.") ¶¶ 27–28, 41, 44.)

Plaintiff's allegations thus arise out of the use of her account: namely that Defendant caused her unique customer account ID, linked with personally identifiable information and the webpages of health tests she browsed and purchased, to be unknowingly sent to a third-party data broker. (*Id.*) The

Registration Terms Plaintiff agreed to govern claims arising out of the creation and use of an account on Defendant's website. (Ex. A (the "Registration Terms") to Defendant's Memorandum of Law in Support of Renewed Motion to Compel Arbitration (the "Mem."), § 1 ("This [Registration] Agreement applies to your use of the Account Service.").) The Registration Terms are clear: "[a]ny dispute . . . related to [the Registration Terms] shall be resolved exclusively by the state and federal courts of the State of New Jersey." (*Id.* § 12.) The Registration Terms go on to say that if there is a conflict between the Registration Terms and any different signed written agreement between the parties related to the account, "th[e] [Registration Terms] will control." (*Id.* § 14.) Because this dispute is unquestionably "related to" the Registration Terms, and those Registration Terms control over any agreements to the contrary, this Court is the proper venue.

Defendant's Memorandum broadly raises the same run-of-the-mill arbitration arguments it made in its first motion. Principally, it invokes a different set of terms presented as part of the purchase process on the website. (*See* Ex. 1-C, the "Purchase Terms," attached to the Ovca Decl.) The Purchase Terms, however, contain a conflicting dispute resolution provision. Whereas the Registration Terms state that "[a]ny dispute … related to [these Registration Terms]"—as this dispute is—"shall be resolved exclusively" in court (Registration Terms § 12), the Purchase Terms, on the other hand, state that "[a]ny dispute between You and Us

concerning an amount less than $750,000 shall be submitted to arbitration." Defendant hardly mentions the Registration Terms at all, briefly claiming that they can stand alone independently from the Purchase Terms, or otherwise be read together harmoniously. (Mem. at 19.) It does not address at all the interplay between the conflicting terms, or that the Registration Terms provide that they "will control" in the event they conflict with another agreement. (Registration Terms § 14.) And besides including a short background section mentioning that arbitration-related discovery took place, the Memorandum does not address the legal import of that discovery (*id.* at 6), which confirmed the key facts Plaintiff asserted in her original opposition that show this dispute "relates to" her account.

Finally, even ignoring the Registration Terms' controlling language, Defendant's motion fails for an independent reason: the Purchase Terms Defendant points to require disputes for more than $750,000 to be brought in court rather than arbitration. The dispute Plaintiff brought to this Court involves claims for more than $5,000,000. Indeed, the jurisdictional basis that empowers the Court to decide the motion to compel in the first place depends on that. For the reasons set out below, the Court should deny Defendant's motion to compel arbitration and allow this case to proceed in federal court.

## II. FACTUAL BACKGROUND

### A. The Complaint's Allegations.

Quest Diagnostics is one of the world's largest publicly traded clinical laboratory companies. (Compl. ¶ 12.) An offshoot, Quest Consumer, Inc., offers direct-to-consumer lab tests that do not require a doctor's referral, including tests for sensitive medical conditions, such as HIV, STDs, pregnancy, and ovarian reserve. (*Id.* ¶¶ 3, 16.) To purchase a lab test on QuestHealth.com, visitors must first create an account. (*Id.* ¶ 26.) During registration, visitors are required to enter personal information such as their first name, last name, gender, date of birth, physical address, phone number, and email address. (*Id.*) To complete the registration process, users click a button next to a disclosure that reads "By clicking 'Register', I agree to the [Registration] Terms and Conditions." (*Id.* ¶ 38.) Plaintiff did so here. (*Id.*) The Registration Terms were accessible via a hyperlink. (*Id.* ¶¶ 38, 39.)

The Registration Terms "[w]elcome [you] to the Quest Consumer Inc. Account Service ("Account Service"). This Account Service allows you to create an account on questhealth.com." (Registration Terms, Preamble.) The Registration Terms "appl[y] to your use of the Account Service." (*Id.* § 1.) Users are informed that "[a]ny dispute between Quest Consumer and You related to this Agreement shall be resolved exclusively by the state and federal courts of the State of New

Jersey." (*Id.* § 12.) The Registration Terms further provide that "[i]f there is any conflict between this Agreement and a signed written agreement between You and Quest Consumer related to the Account Service, this Agreement will control." (*Id.* § 14.)

Plaintiff registered for an account and accepted the Registration Terms. (Compl. ¶¶ 7, 37–38.) She thereafter browsed Defendant's website, searching for various lab tests. (*Id.* ¶ 41.) She ultimately purchased a blood type test for $35. (*Id.*) Unbeknownst to Plaintiff and without her consent, throughout the time she was browsing QuestHealth.com, her interactions were being tracked and shared with a third party. (*Id.* ¶¶ 5–6, 42, 44.) Defendant configured a software package called Tealium iQ to capture and share with third party Tealium various user data points, including Quest customer ID, test specimen ID, test name, order number, email, order total, URLs visited, city, state, zip code, approximate geographical coordinates, gender, birth year, and credit card provider. (*Id.* ¶¶ 27–28.) This happened in the background of Plaintiff's web browser; Defendant directed the browser to transmit this information to Tealium's servers within milliseconds after loading pages on QuestHealth.com. (*Id.* ¶¶ 30, 56.) From there, Tealium used this information to identify Quest customers on various platforms, to deliver personalized advertisements, and to develop machine learning models that predict customers' future purchasing habits. (*Id.* ¶¶ 5, 33–36.) Plaintiff filed this suit on

behalf of herself and a class of other users of Defendant's website, asserting violations of the Wiretap Act, 18 U.S.C. § 2510, *et seq.*, and the New Jersey Wiretapping and Electronic Surveillance Control Act, N.J. Stat. Ann. § 2A:156A-24. (*Id.* ¶¶ 52–63, 64–75.) Plaintiff seeks damages for each violation, which she alleges exceed $5,000,000 in the aggregate. (*Id.* ¶¶ 9, 63, 75.)

**B. Arbitration-Related Discovery.**

The Court-authorized arbitration discovery validated the facts underlying Plaintiff's original opposition to Defendant's motion to compel. Specifically, Defendant reversed course with respect to the Registration Terms. Instead of claiming that they were unauthenticated, unverified, and improperly before the Court, Defendant has conceded they are, in fact, the operative versions that Plaintiff would have agreed to when registering for her account. (Declaration of Paul Rosenthal in Support of the Mem., ¶ 3.) Defendant even went so far as to object to Plaintiff's document request seeking the operative Registration Terms, contending that it was already in her possession. (Ex. 1-D, Def.'s Resp. to Pl.'s Request for Production No. 3, attached to the Ovca Decl.) Defendant further confirmed that there was no way to make a purchase on the website without first registering for an account. (Ex. 1-A, Def.'s Resp. to Interrog. No. 5.) There was no "guest" checkout option on the website, so going through the registration process and agreeing to the terms was a mandatory prerequisite to making a website

purchase. (*Id.*) Arbitration-related discovery also confirmed that the Tealium tracking process—which forms the basis of Plaintiff's lawsuit—occurs before any purchase whatsoever.[1] (*Id*. at Def.'s Resp. to Interrog. No. 6.) Defendant confirmed that "a Customer ID would have been generated and assigned at the point of registration and stay[s] consistent for the same customer in any subsequent transaction where they logged into the website." (Ex. 1-B, Feb. 26, 2026 Email from Def.'s Counsel.) This customer ID was a field that was linked to the Tealium tracker and shared with Tealium, again before any purchase. (Compl. ¶¶ 27–28, 43.)

## III. ARGUMENT

### A. The Registration Terms Mandate Disputes Related to Account Services "Shall Be Resolved Exclusively" by This Court.

Defendant invokes the arbitration provision in the Purchase Terms as the

---

[1] Defendant attempts to paint this as routine website behavior that is "functional and necessary." (Mem. at 6 n.3.) That merits question is, of course, not appropriately before the Court on this motion to compel arbitration. *Kellner v. Amazon, Officers, Directors, and Shareholders*, CV 22-01124 (GC) (JTQ), 2024 WL 4318769, at *3 (D.N.J. Sept. 26, 2024). It is also contradicted by Plaintiff's factual allegations in the Complaint (Compl. ¶¶ 12–36), which must be taken as true for purposes of any forthcoming motion to dismiss. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). When resolving that motion, Defendant's discovery responses are extraneous information that cannot be considered unless the dismissal motion is converted into a motion for summary judgment and plaintiff is afforded an opportunity to take discovery into that merits issue. *S. Millville Props. LLC v. Westchester Surplus Lines Ins. Co.*, 698 F. Supp. 3d 766, 772 (D.N.J. 2023).

sole basis for its motion to compel. (*See generally* Mem.) Defendant, however, ignores that an earlier-agreed-to set of terms, the Registration Terms, govern this dispute and mandate that it "shall be resolved exclusively" in a New Jersey court. (*See* Registration Terms § 12.) And the Registration Terms provide that they control over any conflicting agreements—like the Purchase Terms. (*Id.* § 14.)

Defendant has moved to compel. "[B]efore compelling any party to arbitrate pursuant to the FAA, a court must consider two 'gateway' questions: (1) 'whether the parties have a valid arbitration agreement at all' (i.e., its enforceability), and (2) 'whether a concededly binding arbitration clause applies to a certain type of controversy' (i.e., its scope)." *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 519 (3d Cir. 2019) (quoting *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 186 (2019)). Defendant's last reply briefly attempted to argue that Plaintiff's identification and reliance on the Registration Terms means that she is raising a question about the scope of the arbitration agreement. That is wrong.

Because there are two competing agreements at issue in this case, the Court must address the first gateway question and determine whether there is any operative arbitration agreement at all. *See Field Intel. Inc v. Xylem Dewatering Sols. Inc*, 49 F.4th 351, 356 (3d Cir. 2022) ("[W]e hold that the parties' supersession dispute is for a court, not an arbitrator, to decide."); *Jaludi v. Citigroup*, 933 F.3d 246, 255 (3d Cir. 2019) ("[W]hether a later agreement

supersedes a prior arbitration agreement is tantamount to whether there is an agreement to arbitrate.”). Courts “apply ‘ordinary state-law principles that govern the formation of contracts’ to determine whether [a] subsequent arbitration agreement supersedes a prior agreement.” *Jaludi*, 933 F.3d at 254 (quoting *Century Indem. Co. v. Certain Underwriters at Lloyd’s*, 584 F.3d 513, 524 (3d Cir. 2009)); *see also Hess Corp. v. ENI Petroleum US, LLC*, 86 A.3d 723, 727 (App. Div. 2014) (“Contract interpretation is a question of law.”). Importantly, there is no presumption in favor of arbitrability when making this determination. *Jaludi*, 933 F.3d at 255; *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (“Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind. But a court may not devise novel rules to favor arbitration over litigation.”).

Plaintiff only seeks to comply with the Registration Terms pursuant to their ordinary meaning. In interpreting contracts, “courts first look to the plain meaning of the language at issue.” *Oxford Realty Grp. Cedar v. Travelers Excess & Surplus Lines Co.*, 160 A.3d 1263, 1270 (App. Div. 2017) (citing *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (App. Div. 2008)). “If the language is clear, that is the end of the inquiry.” *Chubb Custom Ins. Co.*, 948 A.2d at 1290 (citing *Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262, 1264 (App. Div. 2001)). Courts may not “create an ambiguity where none exists.” *Int’l Union,*

*United Auto., Aerospace & Agric. Implement Workers of Am. v. Skinner Engine Co.*, 188 F.3d 130, 145 (3d Cir. 1999) (internal quotation and citations omitted); *see also Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir. 1980) ("The strongest external sign of agreement between contracting parties is the words they use in their written contract . . . . [a] court will make no inference or give any construction to the terms of a written contract that may be in conflict with the clearly expressed language of the written agreement."). However, "when a transaction is documented in several agreements, arbitration provisions that conflict or are inconsistent with each other may create ambiguity that will preclude enforceability." *Rosenthal v. Rosenblatt*, A-3753-12T2, 2014 WL 5393243, at *4 (N.J. Super. Ct. App. Div. Oct. 24, 2014). Here, the Registration Terms expressly provide that they govern this dispute, and that they control if they conflict with other agreements.

First, the scope of the Registration Terms: they broadly apply to and govern the creation, access, or use of an account on QuestHealth.com. (Registration Terms, Preamble; § 5.) The Registration Terms' applicability throughout an accountholder's interactions with the QuestHealth.com website is reflected throughout the Terms. (*See id.* § 5 ("All materials available through the Account Service may be accessed, downloaded or printed for the noncommercial purpose and solely within the scope allowable by this Agreement"); *id.* § 2 (discussing

"content accessed through the Account Service" and contemplating any "advice, course of treatment, diagnosis [and] any other information, services or products that you may obtain through the account service."); *id.* § 8 (noting that "[t]he Account Service may include content that You find offensive, including health-related content that is sexually explicit"); *id.* § 9 (warning that "[t]he Account Service may contain third party-owned content (e.g., articles, data feeds, abstracts, etc.) and may also include hypertext links to third party-owned web sites.").) In short, the Registration Terms govern the user's complete use of their account on the website. The Registration Terms provide that all "dispute[s] between Quest Consumer and You related to [these Registration Terms] shall be resolved exclusively by the state and federal courts of the State of New Jersey." (Registration Terms § 12.)

The present dispute is rooted in Defendant's provision of the Account Services, and thus falls within the Registration Terms' ambit and belongs in this Court. As part of the registration process, users were required to input their first name, last name, gender, date of birth, physical address, phone number, and email address. (*Id.* § 3; Compl. ¶ 26; *see also* Declaration of Michael Brunelle ("Brunelle Decl.") in Support of the Mem., ¶ 13.) Upon registration, Defendant assigned users a unique customer ID, which stayed with that user throughout their interactions with the website. (Ex. 1-B, Feb. 26, 2026 Email from Def.'s Counsel.) Defendant

configured the Tealium iQ tag to track users as they browsed the website, linking the URLs they visited on QuestHealth.com with their Quest customer ID assigned to that unique accountholder. (Compl. ¶¶ 27–29.) The Tealium iQ tag certainly captured any tests that an accountholder ordered, as well as key details about that order. (*Id.*) However, accountholders would have their sensitive health information—in the form of the medical tests they were browsing, such as pregnancy or HIV tests—unknowingly disclosed to Tealium even before they purchased a test, or even if they never made a purchase at all. (*Id.* ¶ 29.) Arbitration discovery confirmed this fact, with the Tealium tracking beginning immediately upon visiting the website. (Ex. 1-A, Def.'s Resp. to Interrog. No. 6.) That Plaintiff and accountholders like her could pursue the instant claims without ever making a purchase or clicking any checkbox next to the Purchase Terms at all confirms that this dispute is governed by the Registration Terms in the first instance.

To the extent that individuals like Plaintiff did ultimately make a purchase after registering for an account, which Defendant admits Plaintiff did the same day she agreed to the Registration Terms, (Brunelle Decl. ¶¶ 13–14), that does not change the Registration Terms' applicability to this case. Having an account was a prerequisite to making a purchase on QuestHealth.com, and purchases users made on the website indisputably relate to an account service; no element of Plaintiff's

claim relates solely to the purchase process, standing alone. Despite previously claiming that individuals did not have to make an account to make a purchase on the website (dkt. 19 at 10), arbitration discovery confirmed that Plaintiff had no option to check out as a guest on the website, and that she would have had to go through the registration process to create an account, agree to the Registration Terms, and provide her identifying information. (Ex. 1-A, Def.'s Resp. to Interrog. No. 5; Compl. ¶¶ 26–27; Brunelle Decl. ¶¶ 4–5.) Any purchases were tied to that accountholder's customer ID along with specific details about that purchase, down to the order number, credit card number, and order total. (Compl. ¶¶ 27–28.) The customer ID is therefore not an artifact of the purchase process. It is an account artifact, created under the Registration Terms, which Quest's own system carries forward into every interaction on the platform, including purchases. Quest cannot credibly argue that the Registration Terms govern only "Account Services" while simultaneously relying on a registration-generated identifier as the backbone of the purchase experience. Even after any purchase, information about those tests was housed in the user's account; indeed, the Registration Terms discuss allowing certain third parties—but not Tealium—to access details housed in the account. (Registration Terms § 8 (recognizing that accountholders can "allow a third-party service provider (such as a Personal Health Record or PHR) to retrieve, provide, modify or otherwise use health and other information in Your account or

otherwise").) Defendant acknowledges that users even view their resulting reports by logging into their account, (Brunelle Decl. ¶ 16), a page visit that would be logged and distributed to Tealium.

To the extent Plaintiff's dispute touches the Purchase Terms at all, the Registration Terms expressly provide that they are to control if there are competing terms—such as dispute resolution procedures—between the agreements. (Registration Terms § 14 ("If there is any conflict between this Agreement and a signed written agreement between You and Quest Consumer related to the Account Service, this Agreement will control.").) The Purchase Terms, by contrast, contain no comparable clause. Where the Registration Terms include an integration clause stating that they are "the entire agreement between You and Quest Consumer related to the Account Service, replacing any prior agreements" (Registration Terms § 14), the Purchase Terms are conspicuously missing such language. (*See generally* Purchase Terms.) There is nothing in the Purchase Terms that would rescind or supersede the Registration Terms' express directive that they "will control" in the event of a conflict. (Registration Terms § 14.)

New Jersey contract law principles confirm this fact. Foremost, to hold otherwise would impermissibly ignore the express command of the Registration Terms, which address how conflicting terms across the agreements are to be interpreted and where this case must be filed. *See Mellon*, 619 F.2d at 1009. To the

extent that elements of the Purchase Terms were intended to replace related terms in the Registration Terms, the parties would have had to clearly indicate as much. *See Field Intel.*, 49 F.4th at 359 (finding no supersession when "the [later] contract does not even mention its predecessor, let alone expressly indicate any intent to replace that earlier agreement"); *GMAC Mortg., LLC v. Willoughby*, 165 A.3d 787, 796 (App. Div. 2017). As noted above, the Purchase Terms do not contain any such indication. Thus, Plaintiff is left with two contradictory instructions. Section 14 of the Registration Terms resolves these otherwise-conflicting provisions in favor of this Court's jurisdiction.

Defendant suggests that the Registration Terms and Purchase Terms can be read together and cover distinct subject matter. (Mem. at 19–20.) This does not withstand scrutiny. A cursory review of the Purchase Terms reflects that they implicate account services. Besides the fact that users could not make a purchase without registering for an account, the Purchase Terms themselves contemplate that results are accessed by "logging into questhealth.com," (Purchase Terms § 5), and that after purchase users "visit Your questhealth.com account to adjust Your communication preferences," (*id.* § 6). The Purchase Terms are interwoven with account functionality—and thus the Registration Terms—throughout and cannot be separated out. This is hardly comparable to *Field Intelligence Inc v. Xylem Dewatering Sols. Inc*, where one agreement was a non-disclosure agreement, and

another was a software subscription service agreement entered into four years later, such that they contemplated different subject matter. 49 F.4th 351, 358 (3d Cir. 2022). And in *Symrise, Inc. v. Kennison*, the latter agreement expressly provided that it did not supersede the earlier agreement, which contained an arbitration clause, and there were no conflicting provisions between the two. 24-2657, 2026 WL 575177, at *4 (3d Cir. Mar. 2, 2026) (finding "the plain text of the [later agreement] clearly indicates the parties' intent to incorporate the [earlier agreement], including the arbitration provision therein, into the [later agreement]"). That's not the case here. The Registration Terms mandate resolution "exclusively" in New Jersey courts. The Purchase Terms mandate resolution "exclusively" in arbitration for amounts under $750,000. They cannot simultaneously govern the same dispute over the same conduct. Section 14 of the Registration Terms unambiguously tells the Court which prevails.

### B. The Conflicting Dispute Resolution Provisions Across the Documents Show There Was No Clear Agreement to Arbitrate.

Setting aside the Registration Terms' express direction that they control, the contradictory instructions as to dispute resolution procedure across the documents—particularly when they were all signed the same day—are enough to show insufficient mutuality of assent to arbitration. *See Stabile v. Macy's, Inc.*, 751 F. Supp. 3d 429, 440 (D.N.J. 2024) ("The flavor of one part (arbitration is not required) is at odds with another part (arbitration is required). And that dissonance

generates at least as much in the way of 'misleading . . . lack of clarity' as a small typeface or confusing sentence order."); *Kernahan v. Home Warranty Adm'r of Fla., Inc.*, 199 A.3d 766, 779 (App. Div. 2019) ("[T]he provision[s'] terms cannot be read to provide clarity to a consumer that she was agreeing to arbitration[.]").

Even where competing contracts *all* had arbitration provisions, courts have rejected their application when they were inconsistent across iterations, finding that mutual assent to an arbitration agreement was lacking. In *Souza-Bastos v. Fed. Auto Brokers, Inc.*, for example, a plaintiff signed three different documents in connection with the purchase of a car. A-1594-15T3, 2016 WL 3199488, at *1 (N.J. Super. Ct. App. Div. June 10, 2016). Every one of the documents contained an arbitration clause; however, each arbitration clause varied in the specific compliance requirements. *Id.* And while one version did contain a supersession clause, it was not apparent which document was signed first. *Id.* The court held that *none* of the arbitration clauses were enforceable and denied the motion to compel. *Id.* at *2 ("[T]he cumulative effect of the many inconsistencies and unclear passages in the arbitration terms within the [three documents] compel us to declare them unenforceable for lack of mutual assent.") (quotations omitted); *see also NAACP of Camden Cnty. E. v. Foulke Mgmt. Corp.*, 24 A.3d 777, 797 (App. Div. 2011) ("It is unreasonable to expect a layperson to pore through the many arbitration provisions scattered within these multiple documents and discern which

provisions are operative and exactly what they mean."); *Rockel v. Cherry Hill Dodge*, 847 A.2d 621, 625 (App. Div. 2004) ("[W]e conclude that defendant's inclusion of two conflicting arbitration provisions in the contract documents confounds any clear understanding of the parties' undertaking and tilts the balance . . . in plaintiffs' favor.").

The inconsistency is even more glaring here, where the differing terms provide completely separate dispute resolution processes. "[I]n this case, the difficulty is not a visual or linguistic lack of surface clarity. It runs deeper. The difficulty is the underlying substance itself—the tension between the parts of the asserted contract." *Stabile*, 751 F. Supp. 3d at 440. While Section 14 of the Registration Terms directs how to resolve this tension, its existence demonstrates insufficient mutuality of assent to arbitration in the first place.

### C. The Total Damages at Issue Surpass the Purchase Terms' Threshold to Resolve the Parties' Dispute in This Court.

Even if the Purchase Terms are considered in a vacuum—which, to be clear, they cannot be—Plaintiff's dispute exceeds the damages threshold in the Purchase Terms that would shift the forum from arbitration to this Court. Under any metric, Defendant's motion is appropriately denied.

The excerpt from the Purchase Terms' arbitration provision in Mr. Brunelle's declaration addresses disputes for less than $750,000. (Brunelle Decl. ¶ 9.) But Mr. Brunelle omits the rest of the paragraph—and fails to attach a complete

copy of the Purchase Terms at all. The Purchase Terms plainly state that "[a]ny dispute concerning $750,000 or more will be resolved exclusively in the Federal courts of New Jersey." (Purchase Terms § 25.) In invoking this Court's jurisdiction, Plaintiff asserts that the amount in controversy in this dispute exceeds $5,000,000. (Compl. ¶ 9.) Notably, the provision broadly states that this Court will exclusively resolve "any dispute concerning $750,000 or more." There is no qualifier, as there is with disputes concerning less than that amount, limiting its applicability to "dispute[s] between You and Us." (*Compare* Purchase Terms § 25 ("Any dispute between You and Us concerning an amount less than $750,000 shall be submitted to arbitration…") *with id.* ("Any dispute concerning $750,000 or more will be resolved exclusively in the Federal courts of New Jersey.").) Even if there were such a qualifier, "You" is defined to include "the purchaser of any of the Services." (*Id*., Preamble.) This definition is not limited to an individual purchaser or a purchaser in their individual capacity. (*Id.*) Because this dispute between purchasers of Services, on the one hand, and Defendant, on the other, exceeds $750,000, this Court is the appropriate—and in fact exclusive—forum under the Purchase Terms.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion to compel. *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716

F.3d 764, 774 (3d Cir. 2013) ("[A]rbitrability not being apparent on the face of the complaint, the motion to compel arbitration must be denied . . .").

Respectfully submitted,

Dated: April 17, 2026

By: /s/ Matthew A. Schiappa

Matthew A. Schiappa
mschiappa@lomurrolaw.com
LOMURRO MUNSON, LLC
Monmouth Executive Center
4 Paragon Way, Suite 100
Freehold, New Jersey 07728
Tel: (732) 414-0300
Fax: (732) 431-4043

By: /s/ Michael W. Ovca

Michael W. Ovca*
movca@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378

**Admitted pro hac vice*

*Counsel for Plaintiff and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of April, 2026, the foregoing was served on Defendant's counsel via email, pursuant to the Court's Order dated April 10, 2026 (Dkt. No. 36), at the following addresses:

paul.rosenthal@faegredrinker.com
krista.hartrum@faegredrinker.com

/s/ Matthew A. Schiappa
Matthew A. Schiappa